### GENERAL ELECTRIC CO. v. BROOKLYN HEIGHTS R. CO.

(Circuit Court, E. D. New York. May 29, 1902.)

1. PATENTS—INFRINGEMENT—ELECTRIC RAILWAY MOTORS.

The Bentley patent, No. 338,023, for a system of devices for regulating the current in connection with electric railway motors by the automatic application of a stop or lock to the operator's lever, by which he cuts out the resistance, whenever there is an excess of current, by means of a pawl attracted and held by a magnet while the excess continues, construed, and *held* not infringed by a device which automatically governs the cutting out of resistance, without action by the operator.

In Equity. Suit for infringement of letters patent No. 338,023, for an electric motor, issued to Edward M. Bentley March 16, 1886. On final hearing.

Betts, Betts, Sheffield & Betts (Frederic H. Betts and L. F. H. Betts, of counsel), for complainant.

Mitchell, Bartlett & Brownell (C. E. Mitchell, T. W. Bakewell, H. B. Brownell, and Thomas Ewing, Jr., of counsel), for defendant.

THOMAS, District Judge. This action involves the infringement of letters patent No. 338,023, issued March 16, 1886, which relate to electric motors,—especially those employed upon railroads. The inventor states the mischief which his patent was designed to remedy, as follows:

"My invention consists in certain devices whereby two or more electric motors may be run at varying speeds in multiple arc on the same circuit. This invention is especially applicable to electric motors employed for the impulsion of vehicles upon an electric railway. It is well known that when two or more electric motors are in multiple arc with one another, and run at variable speeds, those motors which run the more slowly will tend to absorb an undue portion of the current, while those which are running at a greater speed will be deprived of the necessary amount of current. This tendency is a source of danger to the slow-running motors, since the surplus of current is apt to be so great as to injure or destroy them. I therefore provide a variable resistance in the circuit of each motor, and also provide a catch or stop which will automatically prevent the removal of too great an amount of resistance from the motor-circuit."

Thereupon the mechanism is described in the language placed below the following figures:

"In the accompanying drawing, M and M' represent two electric motors, connected, respectively, to the driving-wheels of two electric locomotives. Each motor is provided with a lever, L, for shifting the position of the commutator-brushes, and also with a lever, L', which controls an artificial resistance, R, in the motor-circuit. Both the commutator-brushes and the resistance may be controlled by a single lever, if desired. Upon each lever, L', is a toothed sector, A, concentric with the axis of the lever, and in each motor-circuit is an electro-magnet, S, whose armature has a pawl, C, adapted to engage with the teeth of sector, A, when the magnet is energized. The magnet, S, is adapted to respond only to an excess of current beyond a determined point. The operation of this arrangement is as follows: Suppose that the operator of the motor has brought it to a standstill by the insertion of the resistance, R, or by the movement of the brushes, or both. Should he now desire to start the motor under a heavy load, or in a situation where the motor may be blocked in any accidental manner, he would in the usual manner throw his lever, cutting out the resistance, R, and there would result a sudden flow of current through the motor, which would destroy it before it could overcome the inertia of its load or its block, were it not for the action of magnet, S. The magnet, S, becoming energized when the current reaches a predetermined maximum point, draws up its armature and interposes the pawl, C, in the path of any further movement of the resistance-lever, so that a driver will be warned that his current is too great, although he cannot by any degree of carelessness or haste permit the motor to be injured. Various modifications of this device may be employed, the underlying principle of them all being illustrated in the present device, wherein an automatic stop prevents too great a flow of current through any one of several motors in multiple arc."

Superadded are the claims, all of which are alleged to be infringed:

"(1) The combination, with an electric motor, of a resistance in circuit therewith, mechanism controlling said resistance, and an automatic stop for said mechanism. (2) The combination, with an electric motor, of a resistance in circuit therewith, mechanism controlling said resistance, and an automatic stop for said mechanism responding to an abnormal increase of current in the motor-circuit. (3) The combination of two or more electric motors in multiple arc on the same circuit, a resistance in circuit with each mechanism

controlling the same resistances, and automatic stops for said mechanism. (4) The combination, with two or more electric motors in multiple arc, of a resistance in circuit with each mechanism controlling said resistances, and automatic stops for said mechanisms responding to an abnormal increase of current. (5) The combination, with an electric motor, of a resistance in circuit therewith, mechanism controlling said resistance, and means for automatically controlling the movement of said mechanism."

More briefly stated, Bentley invented a system whereby a magnet in the main circuit, energized to a certain point, attracts and sets a pawl, which locks and makes immovable a lever with which the operator cuts out the resistance. With a reduction of the current to a desired point, the magnet relieves the pawl, and the operator continues his removal of the resistance. The complainant's invention is the automatic application of a stop or lock to the operator's lever, when and while there is an excess of electric energy, by means of a pawl attracted and held by a magnet while the excess continues. It may now be considered whether the defendant uses this or equivalent means for obtaining the same result. The defendant's device is described by one of its experts in the language placed below the following figure, to which it refers:

"The defendant is using a multiple unit system in which the cars are grouped in trains. There are two motors on a car, and two, three, or more cars for each train. On each car there is a motor-circuit containing the usual series multiple motor controller, and there is a local operative or controlling circuit through which the main controlling contacts are electrically actuated. There is a platform switch line, through which the switches on the platforms of all the cars are connected together, and there is a train or governing line which extends through every car on the train, whether such car is equipped with electrical propelling apparatus or not; for in a train of four cars only two need be electrically equipped for electric propulsion, while the others are provided with a train or governing line through which the entire motor or propelling power may be governed as a unit, although situated on the extreme ends of the train. * * * There is the so-called 'third-rail,' which is the conductor extending from one end of the line to the other. Its potential or electro-motive force is 500 units; that is, 500 volts. There are trailing contacts, called 'contact shoes,' by means of which the electrical apparatus on the car or train maintains connection with the third rail and generator. The return circuit is through the rails upon which the cars travel,—the traffic rails. On each car there are two motors, M', M². These motors are in circuit with a motor controller. A resistance forms part of this controller, and is designated 49. There are two running positions shown for the controller. The contact plates 1 and 2 indicate the line of commutation where the motors are connected in series with more or less external resistance. The contact plates, 3, 4, 5, indicate the second line of commutation, where the motors are connected in multiple arc or in parallel circuit with

more or less resistance. This motor controller has its moving contacts upon a barrel or cylinder, and geared to this cylinder through the worm-gearing, 31, is a small motor, called a 'pilot motor.' A brake is applied to the shaft of this pilot motor through the influence of a spring which operates to press a brake shoe into contact with a disc fixed to the armature shaft. The motor is included in a branch circuit or a local circuit in which are break points controlled by a relay, 43, in circuit between the two motors, M', M². In the pilot motor circuit is a magnet, 27, and its armature is attached to the brake shoe so that when circuit is complete in the branch containing the pilot motor the brake shoe is withdrawn, and when circuit is broken in the branch the brake shoe is applied by spring pressure as described. In this same branch circuit there is another relay, S. This is connected with the platform switch, P, and this platform switch controls all the motors on all the cars to a certain extent. By putting this switch in any one of three contact positions,—I have only shown one such position,—the pilot motor will run to a point where a certain line of commutation will be perfected by the barrel switch or motor controller. But if, during the run of the pilot motor under the initial or starting movement given it by the motorman, the circuit containing the motors, M', M², and the magnet, 43, becomes overloaded (that is, if the strength of current exceeds a predetermined safe maximum), the magnet, 43, breaks the branch circuit in which the pilot motor is located, and the magnet, 27, releases the brake shoe, which the spring applies to check as soon as possible the further advance of the pilot motor. The circuit of the pilot motor is broken, and a friction brake is applied to check its momentum as far as possible, and without further increasing the strength of current in the motor circuit. That operation might occur at one motor or another, or upon any one of the three cars. The motorman would not know of it. It is entirely automatic. The motorman receives no warning of it, and he is still free to manipulate his platform switch in spite of anything that the automatic mechanism can do. It is a simple safeguard against the possible erratic action of a motor, either from the slipping of wheels or from the overloading of any particular motor. The motorman's switch is not caught and held, as in Bentley's case, so that the motorman has warning."

In short, the defendant uses a pilot motor to cut out resistance, which it does while the local circuit, in which it is, remains closed, and such pilot motor ceases to cut out resistance when the local circuit is opened, which happens when the strength of the main current becomes too great; and a magnet is used to close and open the circuit, and a brake magnet is used to stop the revolving pilot motor after its circuit has been opened and its motive power taken away, and to release it upon the return of such motive power. Hence the removal of resistance is stopped: (1) By opening the circuit which operates the pilot motor. That is the primary cause. (2) By arresting the inertia of the moving pilot motor. That is an auxiliary cause. But after it has once stopped, the resistance lever is not blocked for the purpose of preventing the removal of resistance. The withdrawal of the brake at such a time would not affect it. The operator is not stopped from turning his lever, nor is his lever obstructed, nor is there any reason for locking it, for he does not have to do in any way with the insertion or removal of resistance, save in the initial act of admitting the main current. Bentley contemplated a controller that should, at the will and at the instance of the operator, cut out or in resistance; and so the magnet applying a brake stopped him at a predetermined point. In the defendant's device the operator has nothing to do with the matter. To stay or release is, as to him, all alike. He neither inserts nor withdraws resistance, but a circuit normally open cuts out resistance by the operator start-

ing; and, when this removal has proceeded sufficiently, a broken circuit stops the removal, aided in stopping acquired motion by a brake released by a magnet. It is true that the operator is just as helpless in the one case as in the other, but in Bentley's patent the conception was to arrest physically the arm of a careless or inefficient operator until such time as there was an automatic adjustment of the current. In the defendant's device the power that removes resistance cannot be improvident, for, beyond the instant when its duty has been nicely and fully effective, it is withdrawn. But compare the disenergizing of the brake magnet so as to let the brake drop on the revolving pilot motor, bereft of its motive power, with complainant's device. Defendant's brake magnet, disenergized, lets the brake on. Bentley's magnet, energized, locks the lever. Defendant's magnet, when energized, draws off the brake. Bentley's magnet, when disenergized, unlocks the lever. A magnet is used for each. In one case a magnet is empowered to stop and lock, and by losing such power it releases; while in the other a magnet, by losing power to hold the brake, lets it on, and by gaining power withdraws it. Hence Bentley uses power in the magnet to stop and hold, and loss of power to release; defendant uses power in the magnet to release, and loss of power to stop; and, while the brake is used to stop acquired motion of the pilot motor, it does not hold nor lock the lever. Its function in this regard will be discussed later. But in one case the hand of the operator is stayed; his machinery is locked; he cannot continue his work of cutting out; in the other the current being once turned on, the cutting in and out is done without reference to the operator.

The foregoing has been by way of description and differentiation, but further discussion and conclusion should await some examination of the prior art.

Letters No. 236,460 dated January 11, 1881, issued to Sawyer, are illustrated by the following diagram:

The throttle magnet, A, in a main circuit, attracts its armature attached to the lever, B, and thereby closes a local circuit, wherein a magnet, J, thereupon attracts its armature attached to a lever, K, whereby resistance is brought in. When there has been proper reduction in the current, the retraction spring attached to lever, B, withdraws it from throttle magnet, A, and opens the local circuit so that the magnet, J, has not power to resist the retraction spring that withdraws lever, K, and removes the resistance. What Sawyer did was to use a magnet in a main circuit to close and open a local circuit, wherein a magnet attracted or released a resistance lever, so as to bring in or cut out resistance as the state of the current required. The magnet, J, alternately holds and releases the lever, K, and admits or suspends the removal of resistance. Bentley interposes a pawl to block the lever, hold it at a standstill, and then release it. But Sawyer taught that a magnet and retracting spring could be used (1) to close and open a circuit; (2) to hold and release the lever that cuts in and out resistance. For what purpose? The specification states:

"Our invention relates to devices for automatically regulating the supply of electricity to a system of electric motors in which it is desired to obtain a uniform speed of rotation, as in autographic telegraph-instruments and other apparatus of precision; and it is obvious, of course, that it may with equal advantage be applied to the regulation of electric currents in any apparatus or for any purpose whatever of this or like nature."

Now, what did Bentley do? Lest the motors in multiple arc, which run more slowly, should absorb an undue portion of the current, and those which run at greater speed be deprived of the necessary amount of current, resulting in injuring or destroying the slow-running motors, he provided a variable resistance in the circuit of each motor, and also a catch or stop which would automatically prevent the removal of too great an amount of resistance from the motor circuit. Sawyer did the same thing, save this: He did not use a catch or stop which blocked the resistance lever, but the magnet acted directly upon the lever, and held or released it. So far as the lever is locked by a pawl held by the magnet, Bentley does something in the way of automatically regulating the resistance lever that Sawyer did not do. If the lever, L', in Bentley's patent, were alternately attracted to and released by the magnet, S, without the interposition of the pawl, G, he, in a degree, would do what Sawyer does, by somewhat different means. But the pawl was better for Bentley's purpose, for he wished to lock the lever so thoroughly that the strength of the operator could not move it. Hence the use of the pawl may be regarded as an advance by Bentley. But the fact remains that using a magnet and a retracting spring to close and open a circuit, in which a second magnet should hold a resistance lever, or let it operate, is described with great simplicity in the Sawyer letters. The first claim of the Bentley patent and of Sawyer's patent both show (1) an electric motor; (2) a resistance in circuit therewith; (3) mechanism controlling said resistance; (4) an automatic stop for said mechanism in Bentley, and in Sawyer mechanism caus-

ing a constant vibration,—that is, intermittent holding and releasing of the lever to cut out and introduce resistance. In the defendant's device the throttle magnet is used, as in Sawyer's patent, to open and close the circuit, upon which the action of the resistance lever is dependent, while the brake magnet, when energized, draws away obstruction from the resistance lever, or allows the brake to return thereto, and is not wanting in strong resemblance to the action of the magnet, J, and lever, K, as shown by Sawyer. The use of a magnet in a multiple-arc-circuit, to open circuits that energize electro-magnets so as to attract levers to introduce or to remove resistances, is shown in Edison letters, No. 264,661, dated September 19, 1882:

The levers, c and d, carry pawls, f and e, which engage ratchet wheels, b, which in turn move an arm, a, which introduces or removes resistance, accordingly as the lever, c, is influenced by the magnet, C, or the lever, d, is attracted by the magnet, D. Here is not a pawl automatically locking the resistance arm or lever, under the influence of a magnet, but a pawl that puts in resistance, and another pawl that removes it, but each pawl is connected with an armature lever, itself immediately dependent upon a magnet that is energized by a primary magnet, E, in the main circuit, opening and breaking the circuit. If the pawl introducing resistance held the ratchet wheel, and thereby the resistance arm, until the current was reduced, it would do precisely what the magnet and pawl effect in Bentley's patent; but instead of this there are two pawls. One automatically brings in the resistance as needed, and one cuts it out as required, and both bring the result. But at least the Edison device shows the use of magnets in main and subsidiary circuits to close circuits so as to bring in and remove resistance, and operating the resistance lever for that purpose. But still the resistance lever is not securely locked, as in Bentley's patent.

The Weston patent, No. 266,239, dated October 17, 1882, is as follows:

It shows a magnet in the main circuit, that, when the current passes a predetermined point, by attracting an armature, d, on a lever, F, through which the circuit passes, brakes the circuit, so that the current passes through a resistance and prevents injury to the motor.

In the patent of Levy, No. 286,834, of October 16, 1883, a throttle

magnet, A, in the main circuit, moves a switch, C, and thereby directs a motor, D, which rotates a controller, so as to bring in or cut out resistance, according to the strength of the current.

The Gale patent, No. 319,573, dated June 9, 1885, relates to lamps

or other electrical devices in series, and is intended to restore the circuit interrupted by accidental failure of one lamp. If a lamp burn out, all the lights would be extinguished, if it were not that the main circuit is broken, whereupon a relay magnet releases its armature and closes the circuit through a second magnet, which attracts a pawl and disengages it from a toothed wheel, which allows a lever to be actuated by a spiral spring, and to swing until it has reached two terminals, one on each side of the extinguished lamp. These the lever bridges and closes the circuit by making a shunt about the defective lamp. Thereupon the circuit, through the magnet, is broken, the pawl engages the ratchet wheel, and the lever is held in place. Here is a circuit opened by and closed by a magnet, and a pawl released from and allowed to engage a ratchet wheel to allow a lever to swing or to hold it. This illustrates that it was known that a pawl could be released from or allowed to block a ratchet wheel, carrying a lever, by means of a circuit closing upon the opening of the main circuit.

The five claims of complainant do nothing more than provide for an automatic stop for mechanism controlling resistance in circuit, with an electric motor, or two or more electric motors, in multiple arc, such stop responding to an abnormal increase of current. But it is evident that the prior art requires that the stop or catch be limited to one that physically engages the resistance lever so firmly that the operator cannot move it. The inventor dwells upon this, and the complainant's brief emphasizes this constraint put upon the operator, and the advantages thereof. It has already been seen that the defendant uses two co-operating means for regulating the resistance: (1) A pilot motor on a local circuit, opened or closed by varying conditions of strength of the main circuit; (2) a brake magnet releasing a brake or withdrawing it. The first way is totally unlike any suggestion of the Bentley letters, and, moreover, it was taught plainly by Levy, and, except the pilot motors, by Sawyer, Weston, and Edison. The second way (the use of the brake magnet to stop the movement of the resistance lever) was foreshadowed, but not reached, by Sawyer and Edison. Surely, arresting the removal of resistance by withdrawing the power of the pilot motor has no resemblance to the blocking mechanism that Bentley conceived and described. There is some resemblance between the brake magnet releasing the brake, and Bentley's pawl engaging the toothed sector, but it is very faint. What cuts out the resistance is the revolution of the pilot motor. What makes the pilot motor revolve is the local circuit. What takes away its power to revolve is the opened local circuit. What, then, do the brake magnet and brake do? They overcome quickly the inertia of revolution of the pilot motor. It is true that this sudden cessation of motion does prevent resistance, to an extent, from being removed; and if a brake be an equivalent for an engaging pawl, as it very well might be, the defendant's brake magnet and brake do something of the duty that the complainant does. But the coincidence of action is very slight. The vital purpose of the Bentley device is to stop instantly the moving lever, and hold it stopped against all effort of the motorman. The office of the defendant's brake magnet and brake is to stop the acquired motion. It neither stays the motorman, nor any substitute

for him. It has no relation to the motorman. It is a part of a nicely balanced mechanism, incapable of important error, inserting and removing resistance automatically with intended precision. In defendant's machine the brake plays an auxiliary, but necessary, part in stopping; but thereupon it holds nothing against·any force applied to the resistance lever, because no force is applied to the lever. The vital conception of Bentley of disarming.the motorman—of making him incompetent by automatically locking his lever and holding it locked—is practically absent from the defendant's device. The use of the released brake to overcome the inertia of revolution of the pilot motor is the nearest approach to Bentley's locking device, but this is not an automatic stop, within the meaning or intention of the Bentley patent. The defendant's entire system is radically unlike that of Bentley; its purpose is different, although both involve regulation of the current; and it makes use of the art prior to Bentley, save in the mere matter of the arresting brake. Although Bentley's device was used on a car about 1885 for a short time, it has proved of no commercial or practical value. Nobody seems to have conceived that it could do any useful thing in the modern railway service. It should not be employed at the expiring limit of its useless life to thwart the valuable benefits of defendant's device, now in extensive use, and of which there is no evidence that Bentley had the shadow of perception.

The bill is dismissed.